| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT** <br> **CASE TYPE:  OTHER CIVIL** |

City Center Realty Partners, LLC,                          Case No.: _____

              Plaintiff,

v.

Macy's Retail Holdings, Inc.,                          **SUMMONS**

              Defendant.

THIS SUMMONS IS DIRECTED TO Macy's Retail Holdings, Inc.:

    **1. YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

    **2. YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

        Kristin B. Rowell, Esq.
        Anthony Ostlund Baer & Louwagie P.A.
        90 South 7th Street, Suite 3600
        Minneapolis, MN  55402

    **3. YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    **4. YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

**Exhibit A**

**5. LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

**6. ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

**ANTHONY OSTLUND BAER**
**& LOUWAGIE P.A.**

Dated: January 31, 2017          By:   *s/ Kristin B. Rowell*
                                        Kristin B. Rowell (#331235)
                                        Philip J. Kaplan (#389351)
                                        90 South 7th Street
                                        3600 Wells Fargo Center
                                        Minneapolis, MN 55402
                                        Telephone: (612) 349-6969
                                        Facsimile: (612) 349-6996
                                        krowell@anthonyostlund.com
                                        pkaplan@anthonyostlund.com

**ATTORNEYS FOR PLAINTIFF**

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT<br>CASE TYPE:  OTHER CIVIL |

City Center Realty Partners, LLC,

         Plaintiff,

v.

Macy's Retail Holdings, Inc.

         Defendant.

Case No.: _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff City Center Realty Partners, LLC, as and for its Complaint against Defendant Macy's Retail Holdings, Inc., states and alleges as follows:

**INTRODUCTION**

1.     This case is about the sale of the historic Macy's store building and associated parking garage located on Nicollet Mall and South Seventh Street in downtown Minneapolis (collectively referred to hereinafter as, "Property").  Throughout the majority of 2016 and even earlier, Plaintiff City Center Realty Partners, LLC ("City Center") worked with Defendant Macy's Retail Holdings, Inc. ("Macy's") to purchase the Property from Macy's.  In August, the parties agreed to a fully-executed letter of intent, and then unlike the typical purchase and sale process—where parties negotiate the terms of a purchase and sale agreement and then the buyer conducts its due diligence *afterward*—Macy's required that City Center conduct its due diligence *at the same time* that the parties negotiated the terms of their "Purchase and Sale Agreement."

2.     On the eve of finalizing last minute details of the parties' Purchase and Sale Agreement at the end of December 2016, and only after months of significant financial and time investment by City Center on this project, Macy's abruptly and without explanation terminated

its relationship with City Center and had its broker (not even any Macy's executive) notify City Center that Macy's would be selling the Property to a New York investment firm instead.

3.      Within days of the broker's notification to City Center, local news outlets announced the Macy's sale to the New York investment firm. Meanwhile, City Center's calls to Macy's representatives who City Center had worked with for months went unanswered. Since that time, Macy's has rebuked City Center's efforts toward resolution and has now made clear that it is unwilling to compensate City Center for even a small portion of the significant damages City Center suffered as a result of Macy's unlawful conduct.

4.      City Center brings this action to recover from Macy's the millions of dollars in damages it has suffered due to Macy's actions and omissions. Not only are City Center and Macy's parties to a fully-executed letter of intent, but in addition, City Center reasonably relied on Macy's promises and representations throughout 2016 that City Center would soon close on its purchase of the Property. In reliance on Macy's representations, City Center passed up on numerous other investment opportunities so that it could devote its full-time attention to Macy's. Moreover, City Center incurred tremendous costs believing in good faith (again, based on Macy's representations), that City Center would be the Property's purchaser.

5.      Macy's numerous oral and written promises and representations to City Center during 2016 (indeed, as recently as December 6 and 20, 2016) confirmed for City Center that City Center—and not any other real estate investment firm or anyone else—would be the purchaser of the Property. Were it not for Macy's pulling the rug out from under City Center at the last minute and two days before Christmas, City Center would have finalized the transaction, closed on its purchase of the Property, and reaped the benefits of its significant financial and labor investment it devoted to this Property throughout nearly all of 2016.

2

**PARTIES, JURISDICTION AND VENUE**

6.     Plaintiff City Center is a Delaware limited liability company, although City Center's principals reside in Minneapolis and San Francisco. City Center is a real estate firm specializing in the development, redevelopment and acquisition of urban real estate. City Center has developed and acquired more than $800 million of retail, office, and mixed-use properties, representing over 3 million square feet nationwide.

7.     Defendant Macy's is a New York corporation with its principal place of business in Cincinnati, Ohio, although it is registered to conduct business in numerous states, including Minnesota. Macy's owns and operates retail department stores, including the Macy's retail department store (and associated parking garage) located on Nicollet Mall in Downtown Minneapolis (i.e., the Property).

8.     This Court has personal jurisdiction over Macy's under Minn. Stat. § 543.19 because it owns real property that is situated in Hennepin County and because it regularly transacts business here.

9.     Venue is proper under Minn. Stat. § 542.09 because the causes of action arose, at least in part, in this judicial district.

**FACTUAL BACKGROUND**

A.     **The Letter Agreement**

10.    In or about March 2016, Macy's and City Center began serious discussions about City Center's purchase of the Property from Macy's. The parties had previously discussed a potential real estate transaction involving the Property a couple of years earlier, but their efforts to put together the terms of a transaction finally became serious beginning in March 2016. Over

the next several months, the parties exchanged numerous communications orally and in writing about the parties' desired terms for the transaction.

11.     After months of negotiation, on or about August 11, 2016, Macy's and City Center entered into a letter agreement ("Letter Agreement") for City Center's purchase of the Macy's Downtown Minneapolis store building. (The parties also executed a letter agreement with respect to the parking garage.) The Letter Agreement identifies Macy's as "Seller" and City Center as "Purchaser."

12.     Among other things, the Letter Agreement required Macy's to provide City Center with certain information during the parties' "Due Diligence" period. Categories of information that Macy's was required to provide included "environmental reports concerning the Properties," "soils and engineering reports on the Property," and "such other documents which materially affect the development, management or ownership of the Property."

13.     As explained herein, despite Macy's legal obligation to provide such information to City Center, on or about October 7, 2016—which was two months into City Center's Due Diligence period and after City Center had completed substantial work—City Center independently learned that the Property has significant asbestos issues, a fact which Macy's knew but did not at any time disclose to City Center despite its obligation to do so. Macy's failure to disclose the asbestos problem was the primary factor that held up the signing of the parties' Purchase and Sale Agreement sooner and in turn, the closing of this deal.

14.     Specifically, Macy's refused to allow City Center to conduct a comprehensive asbestos survey that would have much more clearly defined the magnitude of the Property's asbestos problem. Instead, Macy's slowly provided information to City Center about the Property's asbestos problem after City Center's discovery of it, even though Macy's had the

4

information in its possession from the beginning.  Moreover, the information Macy's provided did not give City Center a complete picture of the issue.

15.     In a similar vein, throughout the Due Diligence period, Macy's prohibited City Center from speaking and/or interacting with the City of Minneapolis, even though City Center repeatedly requested that Macy's allow City Center to contact City officials in order to learn information related to City Center's Due Diligence.  In fact, over two months into City Center's Due Diligence, on or about October 12, 2016, Macy's told City Center that City Center was "not authorized to speak to the city [of Minneapolis] at this time."  Weeks later, Macy's finally agreed to allow City Center to speak with the City of Minneapolis, but it was only after word got out that City Center would be purchasing the Property.  Macy's refusal to allow City Center to speak with the City of Minneapolis was another factor that unnecessarily slowed City Center's ability to finalize this deal.

16.     The parties' Letter Agreement also contains a confidentiality provision that requires both parties to maintain the confidentiality of the terms of the transaction as well as the transaction documents.  In its entirety, the Letter Agreement's confidentiality provision provides:

> The parties will maintain the confidentiality of the terms of the transaction and the contents of this letter and transaction documents, except that Purchaser may disclose material terms, which are necessary or required to be disclosed in connection with its due diligence investigations and by applicable law and rules of any exchange applicable to Purchaser or its affiliates.

17.     In a typical purchase and sale real estate transaction, parties exchange a letter of intent, then they negotiate and execute a purchase and sale agreement which includes a future closing date, then they engage in a due diligence period between execution of the purchase and sale agreement and the closing, and then the purchaser closes on its purchase of the property.

18.     Unique to this transaction and unlike the typical process, here, when the parties signed the Letter Agreement, Macy's required that City Center conduct its due diligence <u>at the same time</u> that the parties negotiated the terms of their Purchase and Sale Agreement. That way, Macy's was able to receive the benefit of all of City Center's due diligence activities (including the costs, expenses, and the significant labor investment that City Center made in this project) while at the same time trying to shirk its responsibilities identified in the parties' comprehensive Purchase and Sale Agreement until the Due Diligence period was over.

**B.     The HTC Application**

19.     Between August and December 2016, during the time in which Macy's required that City Center conduct its Due Diligence while the parties negotiated the terms of the Purchase and Sale Agreement, at Macy's request, City Center expended significant sums of money toward its purchase of the Property. Macy's was fully aware of and in fact required City Center to spend this money during the Due Diligence period.

20.     For example, Macy's required that City Center engage a historic tax consultant to prepare, complete and submit a "Part 1 Application" to the State Historic Preservation Office of the Minnesota Historical Society in order to obtain and apply for historic tax credits ("HTCs"). City Center spent a significant amount of time and money on this process, which was an important benefit to Macy's. If HTCs were granted, it would mean an extra several million dollars in Macy's pocketbook for this transaction. The HTC application portion of City Center's investment into its purchase of the Property alone took approximately 60 days and resulted in a report of approximately 50 pages plus the discovery of volumes of original historical photographs.

21.     On or about October 13, 2016, Macy's requested that City Center send to Macy's a draft of City Center's HTC application.  At the time, City Center had been working on the HTC application for a couple of months, but it had yet to submit the application to the State Historic Preservation Office of the Minnesota Historical Society because City Center was waiting for Macy's to provide it with written consents from some of the fee simple interest property owners who had ground leases at the Property.

22.     According to City Center's HTC consultant, consents were required from these fee simple owners prior to submission of the HTC application to the Historic Preservation Office or the application would be rejected.  If the application was rejected, the parties would have to go through the submittal process again, which would take another several weeks, create unnecessary delays, and undoubtedly delay the closing.  At Macy's request, City Center was doing everything possible to get to the closing as quickly as possible for Macy's.

23.     Macy's claimed that it wanted a copy of the application as "proof" that City Center was in fact in a position to submit the HTC application as soon as Macy's obtained the consents.  So, on or about October 14, 2016, in accordance with Macy's request, City Center sent Macy's an email attaching the draft of the "Historic Preservation Certification Application Part I Evaluation of Significance" that was prepared by City Center's HTC consultant.  City Center attached the supporting documents to its email, as well as the Historic Preservation Certification Application Instructions.

24.     In its email transmitting the materials, City Center reminded Macy's of its confidentiality obligation contained in the Letter Agreement, stating specifically that it was "providing this information to [Macy's] in confidence and with the understanding that Macy's wants to review it in order to make an independent determination of whether [] written consent

7

of [the fee simple property owners] is necessary in order for [City Center] to submit the
Application." City Center also stated:

> [City Center] is providing this information to Macy's in confidence and for the sole
> purpose of allowing Macy's to evaluate whether [the Macy's-related property owner's]
> consent is legally required in order to submit the Application. Macy's shall not use this
> information for any other purpose other than for evaluating whether [the property
> owner's] consent is required.

Further, City Center stated that it was "prepared to submit this Application to the [Historic
Preservation Office] once [] the required consents of the fee owners have been obtained [by
Macy's]."

25.    Weeks went by but Macy's still did not provide the consents. In or about mid to
late November 2016, City Center told Macy's that it remained prepared to submit the HTC
application to the Historic Preservation Office, but that it still needed the written consents. By
that point in time, City Center had made numerous requests to Macy's, extending over a period
of several weeks, asking Macy's to provide the consents. In response, Macy's claimed that it
understood the problem and told City Center that it was working to obtain the consents as
quickly as possible.[1]

**C.    The December Meetings To Finalize The Deal**

26.    On or about December 2, 2016, Macy's requested that City Center "provide the
accompanying photos in the photo log" for the HTC application because Macy's "never received
the actual pictures." Meanwhile, a few days later, on or about December 6, 2016, City Center
principals flew to New York to meet with Macy's executives. The meeting took place in New
York City. The purpose of the meeting was to finalize the last details of the parties' deal.

---

[1] Ultimately, Macy's did not provide City Center with the written consents. Upon information
and belief, Macy's never obtained the consents.

27.     The December 6 meeting was extremely productive.  The meeting was an opportunity for decision makers from City Center and Macy's to meet in person and tie-up the final details of the transaction.  During the meeting, Macy's represented to City Center that it knew the parties would come to final terms on the Purchase and Sale Agreement despite the asbestos issue (the parties were still trying to sort out who should bear the final small percentage of the remediation costs) and that Macy's was not negotiating with anyone else.

28.     Also during the December 6 meeting, the parties discussed consolidating what were two separate purchase and sale agreements for the Macy's store building and the parking garage into one Purchase and Sale Agreement for the Property.  By this point in the parties' negotiations, the parties had exchanged numerous iterations of what essentially became the final Purchase and Sale Agreement.  The parties were down to finalizing only a few minor points before physically signing the Agreement.

29.     Following the December 6 meeting, at Macy's specific direction, City Center instructed its legal counsel to consolidate the two Purchase and Sale Agreements and, on or about December 14, 2016, City Center's legal counsel sent a final draft of the Purchase and Sale Agreement to Macy's.  That Purchase and Sale Agreement included all of the essential terms of the parties' transaction other than a minor disagreement related to Macy's belated disclosure of the Property's asbestos problem, which Macy's assured City Center would be resolved.

30.     Meanwhile, two days after the meeting, on or about December 8, 2016, City Center sent Macy's a follow up email to the December 6 meeting.  One of the topics of the email—which was also discussed during the December 6 meeting—was the issue of Macy's December 2 request for the HTC photographs.  Macy's told City Center it wanted to review the photographs while reviewing the HTC application that City Center had previously and

9

confidentially provided to Macy's.  In response, City Center arranged for its consultant to have

the original photographs delivered to City Center immediately so that City Center could

overnight the photographs to Macy's.[2]

31.    That same day, City Center sent Macy's the original photographs via Federal

Express.  In the letter transmitting the photographs, City Center reminded Macy's of its

confidentiality obligation in the Letter Agreement, stating, "enclosed for your review are the

photographs that correspond to the photo log... [City Center] is providing the information to

Macy's in confidence and for informational purposes only."

32.    Incredibly, contrary to City Center's provision of the application and photographs

to Macy's, and in complete disregard of Macy's confidentiality obligation set forth in the Letter

Agreement, Macy's submitted the nearly completed application for tax credits and the original

photographs to the State Historic Preservation Office and claimed City Center's (and City

Center's consultant's) work product as its own.  Macy's took advantage of this and other of City

Center's good faith investments into City Center's purchase of the Property.

33.    When City Center confronted Macy's about the HTC application, Macy's

represented to City Center that it had submitted the HTC application only in an effort to advance

the deal with City Center.  Macy's assured City Center, as it had on multiple occasions, that it

fully intended to close on the deal with City Center and that Macy's was not negotiating with

anyone else.

---

[2] By that time, City Center was expediting all of Macy's requests, and City Center was providing
rapid responses to all of Macy's questions.  City Center worked tirelessly for Macy's to
accommodate Macy's expressed desire to complete the transfer of the Property by January 31,
2017, which was Macy's desired closing date and the end of Macy's fiscal year.

34.     On or about December 9, 2016, City Center communicated to Macy's that the parties "should plan on speaking on Monday [December 12] to get everything wrapped up." Macy's did not object or otherwise disagree that the parties would be able to wrap up the transaction details shortly.

35.     On or about December 14, 2016, City Center sent its final revised Purchase and Sale Agreement to Macy's. When City Center sent its final revisions to the Purchase and Sale Agreement, City Center believed in good faith, based on Macy's representations throughout their negotiations, including but not limited to Macy's representations during their December 6 meeting in New York, that all essential terms of the Purchase and Sale Agreement were agreed upon and that Macy's would execute the written document.

36.     On or about December 20, 2016, Macy's and City Center executives had a telephone conference about the transaction. During that call, Macy's represented to City Center that the parties were only "a couple of days away" from signing the Purchase and Sale Agreement. Macy's specifically represented that it should be able to finalize the Agreement within the next couple of days because there were not any substantive issues in the last round of edits on the document between the parties. In addition, Macy's reaffirmed its commitment to City Center that Macy's was not negotiating with anyone else.

37.     By December 20, 2016, the parties had reached an agreement on all material terms of the transaction—the parties had come to a meeting of the minds on all aspects of the deal, including financing. Macy's knew City Center intended to close with cash. The only outstanding item was a small disagreement over the cost of remediating the asbestos in the building, but Macy's had represented to City Center on December 6 (and again on December 20)

that it knew the parties would come to final terms on the Purchase and Sale Agreement despite the asbestos issue.

**D.     Macy's Abruptly Backs Out**

38.     City Center was shocked then, when, on or about Friday, December 23, 2016, one of City Center's principals received a call from Macy's broker (not even a Macy's executive) telling City Center that Macy's had come to terms on a written purchase and sale agreement with a different purchaser and that the signing of the purchase and sale agreement with that buyer was apparently imminent.  Upon information and belief, at some point since that date, Macy's signed a purchase and sale agreement with that new buyer.

39.     In light of the fact that Macy's already executed a formal purchase and sale agreement with its new buyer, the only logical conclusion that can be reached is that Macy's was negotiating with the new buyer for weeks if not months, at the same time that City Center was continuing in its good faith negotiations with Macy's, at the same time that Macy's was telling City Center that it was not negotiating with anyone else, and at the same time that City Center was continuing to invest heavily into this real estate transaction pursuant to Macy's requirement.

**E.     City Center's Damages**

40.     As described herein, Macy's decision to back out of the deal at the eleventh hour has caused City Center to suffer significant damages.  Not only did City Center expend hundreds of thousands of dollars believing in good faith, based on Macy's own representations, that City Center was the buyer of this Property; now that Macy's pulled out, City Center has lost millions.

41.     City Center's damages include, but are not limited to, the following categories of expenses:  architectural fees, elevator consultant charges, structural engineering costs, legal fees, zoning application fees, environmental investigation charges, consulting fees, public relations

fees, appraisal and tax projection costs, and other incidental charges including travel expenses, not to mention the extraordinary lost management fees, development fees, investment fees and other lost profits because City Center was prevented from closing on its purchase of the Property.

42. By way of example, City Center spent enormous research and investigative costs in an effort to get its arms around the magnitude of the Property's asbestos problem—a problem about which Macy's decided not to disclose to City Center. Indeed, it was not until early October 2016 that City Center discovered the asbestos problem, along with the reality that the asbestos problem will cost millions of dollars to fix. Yet despite intense negotiations between the parties over the effect of the asbestos problem on the purchase price, as of the end of December 2016, the parties were only a few hundred thousand dollars apart over the asbestos issue on a nearly $50,000,000 transaction, and the parties were just days away from signing the Purchase and Sale Agreement.

43. In addition, City Center's principals invested and have now lost hundreds of hours of time into finalizing the transaction in the month of December 2016 alone (and hundreds more in the weeks and months leading up to that). Specifically, City Center's principals spent hundreds of hours each month in the months of July, August, September, October, November and December 2016. In fact, one of City Center's principals worked more than 70% of his time on this project between July and November 2016 and full-time on this project in December 2016 so that City Center could meet the parties' agreed-upon goal of signing the Purchase and Sale Agreement the last week of December and closing on City Center's purchase of the Property by the end of January, the end of Macy's fiscal year.

44. Moreover, City Center's investments into its purchase of the Property have caused City Center to lose out on other viable investments due to the significant investment of time and

attention City Center made in good faith toward this purchase. City Center passed on opportunities to purchase other properties around the country because of the time and attention required by Macy's to finalize this Property transaction. City Center simply didn't have the time to work on other projects in light of the numerous last minute activities that, as a direct result of Macy's lack of diligence, were required to be performed by City Center in order to finalize the purchase of the Property from Macy's.

45.     In addition, City Center lost out on other significant investment opportunities over the past several months so that it could maintain its focus, time, and attention on its purchase of this Property. City Center passed on these other opportunities based on its reliance on Macy's repeated representations that the Property would be sold to City Center and no one else.

46.     Furthermore, City Center invested significant time and money into its purchase of the Property by interfacing for Macy's with the City of Minneapolis, obtaining title objection letters, educating Macy's on the fact that the building and parking garage aspects of the Property cannot be separated from one another, undertaking significant architectural work, and working to gain necessary approvals from the City of Minneapolis relative to the transaction.

47.     City Center did not undertake all of these activities and investments so that Macy's could appropriate this work and use it for another buyer; these investments were made in furtherance of City Center's purchase of the Property, which Macy's communicated its commitment to City Center for many months. The parties were on the verge of closing on City Center's purchase of the Property when City Center received the shocking news that Macy's intended to imminently sign a purchase agreement with someone else.

## SPECIFIC CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT

48.     City Center restates and incorporates the allegations of all preceding paragraphs as if fully set forth herein.

49.     Macy's entered into a written contract with City Center when it entered into the Letter Agreement. The Letter Agreement provides, among other things, that Macy's must maintain strict confidentiality in that it will not disclose the terms of the transaction or the transaction documents to anyone. The Letter Agreement also provides that Macy's will provide City Center with environmental reports concerning the Property and such other documents that materially affect the development, management or ownership of the Property.

50.     Macy's breached its confidentiality obligation in its contract with City Center when it submitted the HTC application and original photographs to the Historic Preservation Office. In addition, upon information and belief, Macy's breached its confidentiality obligation in its contract on one or more other occasions because it disclosed other transaction documents to the Historic Preservation Office, Macy's new buyer and/or others, in violation of the Letter Agreement.

51.     In addition, Macy's breached its contract with City Center by failing to disclose the asbestos problem to City Center. Upon information and belief, Macy's had in its possession one or more environmental reports concerning the Property and/or other documents identifying the asbestos issue at the Property, but Macy's failed to disclose that information to City Center.

52.     As a direct and proximate result of Macy's breaches of contract, City Center has been damaged in an amount in excess of $50,000, the exact amount of which will be proven at trial.

## COUNT TWO
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

53.     City Center restates and incorporates the allegations of all preceding paragraphs as if fully set forth herein.

54.     Macy's entered into a contract with City Center when it entered into the Letter Agreement.  Minnesota law implies a covenant of good faith and fair dealing into every contract. Macy's owes City Center a duty of good faith and fair dealing in performing and carrying out its contract with City Center.

55.     By its above-described acts and omissions which include, but are not limited to, failing to disclose the Property's asbestos problem, failing to obtain written consents from the fee simple land owners who have ground leases at the Property so that City Center could timely submit a complete HTC application, requiring City Center to send its draft HTC application as "proof" of its completeness and then turning around and submitting it to the Historical Preservation Office itself, and prohibiting City Center from speaking with the City of Minneapolis, Macy's has breached its covenant of good faith and fair dealing.  Macy's conduct made it impossible for City Center to finalize this transaction sooner because Macy's repeatedly created unnecessary issues for City Center that had to be resolved.

56.     As a direct and proximate result of Macy's breaches of the implied covenant of good faith and fair dealing, City Center has been damaged in an amount in excess of $50,000, the exact amount of which will be proven at trial.

## COUNT THREE
### PROMISSORY ESTOPPEL

57.     City Center restates and incorporates the allegations of all preceding paragraphs as if fully set forth herein.

16

58.    Macy's made clear and definite promises to City Center which include, but are not limited to, the following: (a) Macy's is not negotiating with anyone else other than City Center; (b) Macy's *only* wants a copy of the draft HTC application so that it could review it for "proof" that it was ready to be submitted to the Historic Preservation Office if Macy's obtained the written consents from the fee simple interest owners; (c) City Center is the would-be purchaser of this Property; (d) the parties are only "a couple of days away" from signing the Purchase and Sale Agreement; (e) Macy's is committed to executing the final Purchase and Sale Agreement during the last week of December 2016; and (f) Macy's will close on its sale of the Property to City Center by the end of January 2017.

59.    Macy's intended to induce reliance on City Center with its promises. For example, Macy's instructed City Center to send Macy's the completed HTC application for "proof" that the application was ready to go, so in reasonable reliance on Macy's representation, City Center sent the completed application and original photographs to Macy's. Macy's then took City Center's completed application, submitted it to the Historic Preservation Office itself, and, upon information and belief, is using the application with its new buyer.

60.    In addition, at the same time Macy's was making its representations of "you're the only one" to City Center, and while City Center continued to negotiate with Macy's in good faith in reasonable reliance on these representations, upon information and belief, Macy's was negotiating a separate purchase and sale agreement with its new buyer. Macy's did not disclose its negotiations with the new buyer to City Center, so City Center continued investing in its purchase of the Property based on Macy's simultaneous commitment representations to City Center.

61.     City Center relied on Macy's promises to its detriment by investing significant sums of money into the transaction on numerous expenditures which include, but are not limited to, the categories of costs identified above.

62.     In addition, City Center relied on Macy's promises to its detriment by making extraordinarily significant investments of time into the project. In fact, due to the substantial time commitments made to Macy's by City Center's principals in order to facilitate this transaction within Macy's desired timeline, City Center was forced to turn down a number of other offers to bid on and/or purchase other large scale buildings throughout the United States.

63.     Macy's promises to City Center must be enforced to prevent injustice. Unless Macy's promises are enforced, City Center will lose millions of dollars through a combination of hard due diligence costs already expended on this project and significant lost management, development, investment fees, and other lost profits.

64.     City Center is entitled to equitable relief and damages in at least the amount of $50,000, plus attorney's fees, costs, disbursements and other expenses as allowed by law, the exact amount of which will be proven at trial.

## COUNT FOUR
## UNJUST ENRICHMENT

65.     City Center restates and incorporates the allegations of all preceding paragraphs as if fully set forth herein.

66.     By its actions more specifically described above, Macy's has been unjustly enriched and City Center has been unjustly damaged in an amount in excess of $50,000, the exact amount of which will be proven at trial.

67.     Due to the unjust damage that City Center has suffered as a result of Macy's unjust enrichment, City Center is entitled to equitable relief and damages, plus attorney's fees,

costs, disbursements and other expenses as allowed by law, the exact amount of which will be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, City Center prays that this Court enter an Order:

1.      Entering judgment in favor of City Center and against Macy's, in an amount in excess of $50,000, exclusive of interest and costs and disbursements;

2.      Awarding City Center damages in at least the amount of $50,000, the exact amount of which will be proven at trial;

3.      Awarding City Center its costs, disbursements, expenses and attorneys' fees together with pre- and post-judgment interest to the greatest extent allowed by law; and

4.      For all other relief that the Court deems just and equitable.

## JURY TRIAL DEMAND

City Center hereby demands a jury trial on any and all claims so triable in this matter.

**ANTHONY OSTLUND BAER
& LOUWAGIE P.A.**

Dated:  January 31, 2017      By:    *s/ Kristin B. Rowell*
                                     Kristin B. Rowell (#331235)
                                     Philip J. Kaplan (#389351)
                                     90 South 7th Street
                                     3600 Wells Fargo Center
                                     Minneapolis, MN  55402
                                     Telephone: (612) 349-6969
                                     Facsimile: (612) 349-6996
                                     krowell@anthonyostlund.com
                                     pkaplan@anthonyostlund.com

**ATTORNEYS FOR PLAINTIFF**

## ACKNOWLEDGEMENT

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, to the parties against whom the allegations in the Summons and Complaint are asserted.

By: *s/ Kristin B. Rowell*

20