# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| City Center Realty Partners, LLC, | Civil No. 17-CV-528 (SRN/TNL) |
| **Plaintiff,** | **MEMORANDUM OPINION**<br>**AND ORDER** |
| v. | |
| Macy's Retail Holdings, Inc., | |
| **Defendant**. | |

---

Kristin B. Rowell and Philip J. Kaplan, Anthony, Ostlund, Baer & Louwagie, P.A., 90 South Seventh Street, Suite 3600, Minneapolis, Minnesota 55402, for Plaintiff.

Barbara P. Berens, Carrie L. Zochert, and Erin K. Fogarty Lisle, Berens & Miller, P.A., 3720 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402, and Chad David Silker, Macy's Law Department, 11477 Olde Cabin Road, Suite 400, St. Louis, Missouri 63141, for Defendant.

---

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on the Motion to Dismiss [Doc. No. 6] filed by

Defendant Macy's Retail Holdings, Inc. ("Macy's"). For the reasons set forth herein,

Defendant's motion is granted.

## I. BACKGROUND

Plaintiff City Center Realty Partners, LLC ("City Center") filed this suit against

Macy's, arising out of a dispute concerning the parties' negotiation for the potential sale

of the Macy's building and parking garage on Nicollet Mall in Minneapolis (the

1

"Property"). (See Compl. [Doc. No. 1-1].)  Invoking diversity jurisdiction, City Center

asserts four common law claims, under Minnesota law, against Macy's: (1) breach of

contract; (2) breach of the implied covenant of good faith and fair dealing; (3) promissory

estoppel; and (4) unjust enrichment.

### A.    Letter of Intent

Plaintiff alleges that throughout most of 2016, "and even earlier, [it] worked with

[Macy's] to purchase the Property from Macy's."  (Id. ¶ 1.)  After several months of

negotiation, in August 2016, the parties executed a Letter of Intent, for which Macy's was

denominated the "Seller."  (Id. ¶¶ 1; 11.)

The Letter of Intent "outline[d] the general terms and conditions" under which

Macy's was "prepared to consider the sale of its interest in the [Property] . . . and to

complete negotiations on a mutually acceptable [Purchase Agreement.]"  (Letter of Intent

at 1 [Doc. No. 10-1], Ex. A to Berens Decl.)[1]  The parties acknowledged that the Letter of

Intent was "in no way intended to be a complete or definitive statement of all the terms

and conditions of the proposed transaction," but was instead subject to "the negotiation

and execution of the Purchase Agreement."  (Id. at 5.)  Thus, the parties recognized that

but for limited exceptions, they were not legally bound to each other unless and until they

fully executed the Purchase Agreement.  (Id.)   There is no dispute that the parties failed

to enter into the Purchase Agreement.

---

[1] All references to the Letter of Intent are found in Exhibit A to the Berens
Declaration.

The exceptions to the otherwise non-binding portions of the Letter of Intent, i.e.,

the binding, obligatory provisions, include the following:

(1) the Purchaser's deposit of $500,000 in Initial Earnest Money, held in escrow, (id. at 1, 5);

(2) a provision barring the Seller from negotiating for or accepting any offers to purchase or sell the property from any other person for a period of 30 days after the Letter of Intent was executed on August 15, 2016, i.e., until September 14, 2016,[2] (id. at 5);

(3) a Confidentiality Clause requiring both parties to maintain the confidentiality of the terms of the transaction, the contents of the Letter of Intent, and transaction documents; (see id.);

(4) portions of a Due Diligence Clause, noted below, regarding the Purchaser's physical inspection of the property within the initial 60-day Due Diligence Period, commencing from the Letter of Intent's date of execution; (see id. at 3, 5); and

(5) the return of the Purchaser's Initial Earnest Money if the parties failed to execute the Purchase Agreement.  (Id. at 5.)

As relevant here, the physical inspection provision states:

During the initial 60-day Due Diligence Period, Purchaser may, in its sole discretion, conduct any testing with respect to the Property [that] Purchaser deems advisable, including, but not limited to environmental testing and roof and building inspections (the "Physical Inspection"); provided, however, that Purchaser shall (i) provide written notice of any non-intrusive work within 24 hours before such work, and (ii) provide written notice of any intrusive work, including the scope and work plans, which shall be approved and scheduled in advance with Seller's representative.  Seller shall approve or disapprove of the work plans for intrusive work within five

---

[2]  The Letter of Intent bears the date of August 11, 2016 on its first page and Plaintiff's Complaint refers to the parties entering into the letter agreement "on or about August 11, 2016."  (Compl. ¶ 11.)  However, because City Center's representative signed and dated the Letter of Intent on August 15, 2016, (see Letter of Intent at 6), the Court refers to this later date as the date of the document's execution.

(5) days of presentation of the scope of work plans. Soil sampling will not
be permitted without Seller's prior written consent and unless such testing
is clearly warranted; provided, however that such consent will not be
unreasonably withheld, conditioned or delayed. At Seller's option, a
representative of Seller may be present whenever Purchaser is at the
Property.

(Id. at 3.) Based on the execution date of the Letter of Intent, the initial 60-day Due

Diligence Period ran through October 14, 2016.

As to other provisions of the Letter of Intent relevant to this lawsuit, the letter

contains Macy's acknowledgment of City Center's intention to pursue "Historic Tax

Credits" in connection with the proposed purchase. (Id.) While Macy's agreed to

cooperate with this process, City Center's pursuit of the credits was to be undertaken "at

no cost or obligation to [Macy's]." (Id.) If City Center failed to submit its application for

tax credits within 60 days of August 15, 2016, i.e., October 14, 2016, Macy's had the

right to terminate the Letter of Intent and the potential Purchase Agreement. (Id.) And,

in the event that the Purchase Agreement was not executed, or there was no closing, City

Center agreed to transfer to Macy's the ownership of any work and materials relating to

the Historic Tax Credits. (Id.)

### B.     City Center's Allegations

#### 1.     Hindrance of Due Diligence Work

City Center asserts that the Letter Agreement required Macy's to provide certain

information to City Center during the Due Diligence Period, including "environmental

reports concerning the Propert[y]," "soil and engineering reports on the Property," and

"such other documents which materially affect the development, management or ownership of the Property." (Compl. ¶ 12.) But City Center alleges that two months into the Due Diligence Period, it independently learned of significant asbestos issues on the Property, which Macy's did not disclose, "despite its obligation to do so." (Id. ¶ 13.) Morever, Plaintiff alleges that Macy's refused to permit it to conduct a comprehensive asbestos survey on the Property, and instead, slowly provided information to City Center concerning the asbestos problem. (Id. ¶ 14.) Further, the provided information "did not give City Center a complete picture of the issue," City Center alleges. (Id.)

In addition, City Center alleges that Macy's prohibited it from speaking or interacting with the City of Minneapolis in order to obtain information related to the due diligence process, despite City Center's numerous requests to do so. (Id. ¶ 15.) Further, City Center alleges that the asbestos issues and Macy's refusal to let City Center obtain information from the City of Minneapolis unnecessarily delayed its ability to finalize the parties' Purchase Agreement and, in turn, the closing of the deal. (Id. ¶¶ 13, 15.)

City Center asserts that the transaction process here was atypical for real estate transactions. (Compl. ¶¶ 1, 18.) In a typical purchase and sale transaction for real estate, Plaintiff alleges that "parties exchange a letter of intent, then they negotiate and execute a purchase and sale agreement which includes a future closing date, then they engage in a due diligence period between execution of the purchase and sale agreement and the closing, and then the purchaser closes on its purchase of the property." (Id. ¶ 18; see also id. ¶ 1.) In its dealings with Macy's regarding the Property, however, City Center asserts

that after the Letter of Intent was executed, "Macy's required City Center to conduct its due diligence <u>at the same time</u> that the parties negotiated the terms of their Purchase and Sale Agreement." (<u>Id.</u> ¶ 18.) City Center alleges that this arrangement allowed Macy's to reap the benefits of City Center's due diligence efforts and to "shirk its responsibilities identified in the parties' comprehensive Purchase and Sale Agreement until the Due Diligence [P]eriod was over." (<u>Id.</u>)

Moreover, City Center alleges that between August and December 2016, while the parties negotiated the terms of the Purchase Agreement, City Center expended considerable sums of money toward the purchase of the Property. (<u>Id.</u> ¶ 19.) It asserts that Macy's was aware of these expenditures, and, "in fact required City Center to spend this money during the Due Diligence [P]eriod." (<u>Id.</u>)

### 2. Historic Tax Credit Application

City Center identifies its work with respect to the Historic Tax Credit Application as an example of time-intensive work that Macy's required it to perform. (<u>Id.</u> ¶ 20.) Such work, City Center attests, was an important benefit to Macy's and would result in "an extra several million dollars in Macy's pocketbook for the transaction." (<u>Id.</u>)

On October 13, 2016, Macy's requested that City Center send to Macy's a draft of the Historic Tax Credit Application, which City Center had been working on "for a couple of months," but had yet to submit it to the State Historic Preservation Office. (<u>Id.</u> ¶ 21.) City Center alleges that its delay in submission was caused by Macy's failure to provide written consents from some of the property owners who had ground leases at the

Property. (Id. ¶ 22.) City Center's Historic Tax Credit consultant had advised that such consents were necessary for the consideration of the application, or it would be rejected, resulting in delay. (Id.) City Center alleges that Macy's demanded "proof" that City Center "was in a position to submit the [Historic Tax Credit] application as soon as Macy's obtained the consents." (Id. ¶ 23.)

City Center emailed the requested information to Macy's, attached to a transmittal message stating that it was "providing this information to [Macy's] in confidence and with the understanding that Macy's wants to review it in order to make an independent determination of whether [ ] written consent of [the fee simple property owners] is necessary in order for [City Center] to submit the Application." (Id. ¶ 24.) City Center further stated, "Macy's shall not use this information for any other purpose other than for evaluating whether [the property owner's] consent is required." (Id.) Additionally, City Center indicated that once it obtained the property owners' consents, it would submit the application. (Id.)

City Center alleges that after several weeks elapsed, it reminded Macy's that it was prepared to submit the application once Macy's provided the written consents. (Id. ¶ 25.) Macy's allegedly informed City Center that it was working to obtain the consents as quickly as possible, although City Center believes that Macy's never obtained them. (Id.)

On December 2, 2016, Macy's asked City Center to provide photos that accompanied the Historic Tax Credit Application, which were not previously sent to

Macy's.  (Id. ¶ 26.)  At a December 6, 2016 meeting between the parties' executives,

Macy's allegedly repeated its request for the photos, (id. ¶ 30), and followed up by email

on December 8.  (Id.)  City Center alleges that it sent the photographs to Macy's on

December 8, accompanied by a transmittal letter stating, "enclosed for your review are

the photographs that correspond to the photo log . . . [City Center] is providing the

information to Macy's in confidence and for informational purposes only."  (Id. ¶ 31.)

City Center asserts that Macy's subsequently submitted the Historic Tax Credit

Application and photographs itself, claiming the work of City Center and its consultant as

Macy's own work.  (Id. ¶ 32.)  These actions, City Center alleges, violated the

Confidentiality Clause in the Letter of Intent, and apparently, the confidentiality language

in City Center's transmittal documents.  (Id.)  When City Center confronted Macy's about

the submission of the Historic Tax Credit Application, City Center alleges that Macy's

represented that it had submitted the application only to move the process along.  (Id. ¶

33.)  In addition, Macy's allegedly assured City Center that it intended to close on the

deal and was not negotiating with other potential buyers.  (Id.)

### 3.    Alleged Verbal Representations in December 2016

City Center asserts that on December 9, 2016, it suggested that the parties speak on

Monday, December 12, to "'get everything wrapped up,'" to which Macy's did not

disagree or otherwise object.  (Id. ¶ 34.)  On December 14, 2016, City Center alleges, it

sent its "final version" of the revised Purchase Agreement to Macy's.  (Id. ¶ 35.)  In doing

so, City Center asserts that it held a good faith belief, based on Macy's representations

throughout the negotiations, that all essential terms of the Purchase Agreement were agreed upon and that Macy's would execute the document.  (Id.)

A few days later, on December 20, 2016, the parties' executives held a telephone conference.  (Id. ¶ 36.)  City Center asserts that during the call, Macy's stated that it was only "'a couple of days away'" from signing the Purchase Agreement because there were no substantive edits remaining.  (Id.)  Further, City Center alleges that Macy's "reaffirmed its commitment to City Center that it was not negotiating with anyone else." (Id.)  By December 20, 2016, City Center asserts, the parties had reached a complete meeting of the minds on all of the material terms of the transaction, with a single outstanding area of disagreement remaining as to the cost of asbestos remediation.  (Id. ¶ 37.)

City Center alleges that on December 23, 2016, it was shocked when one of its principals received a call from a Macy's broker, informing it that Macy's had reached an agreement with a different purchaser of the Property, with whom the signing of a purchase agreement was "imminent."  (Id. ¶ 38.)  City Center further asserts that because "Macy's had already executed a formal purchase and sale agreement with its new buyer, the only logical conclusion that can be reached is that Macy's was negotiating with the new buyer for weeks or months, at the same time that City Center continued its good faith negotiations with Macy's, and at the same time that Macy's represented that it was not negotiating with another buyer."  (Id. ¶ 39.)

Throughout all of this negotiating period, City Center alleges, it continued to

invest heavily in the proposed real estate transaction.  (Id.)  It asserts that in addition to expending hundreds of thousands of dollars during the August to December 2016 time period on the proposed transaction with Macy's, it lost millions of dollars in missed opportunities related to other viable investments.  (Id. ¶¶ 40–44.)  In addition, City Center alleges that it invested considerable time and money by communicating with the City of Minneapolis, on Macy's behalf, regarding issues concerning title, the parking garages, architectural work, and various city approvals.  (Id. ¶ 46.)

### C.    Macy's Motion to Dismiss

In response to City Center's Complaint, Macy's filed the instant Motion to Dismiss.  Macy's moves for dismissal of the Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Def.'s Mem. Supp. Mot. to Dismiss at 1–3 [Doc. No. 8].)

## II.    DISCUSSION

### A.    Standard of Review

When evaluating a motion to dismiss, the Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to Plaintiff.  Zink v. Lombardi, 783 F.3d 1089, 1098 (8th Cir. 2015) (citing United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012)).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with

sufficient specificity "to raise a right to relief above the speculative level." <u>Id.</u> at 555. Accordingly, courts need not accept as true wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. <u>See</u> Fed. R. Civ. P. 12(d). The Court may, however, consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings. <u>Roe v. Nebraska</u>, 861 F.3d 785, 788 (8th Cir. 2017) (citations omitted). Here, the Court considers the Letter of Intent because it is necessarily embraced by the pleadings and provides the basis for Plaintiff's breach of contract claim.

## B.     Breach of Contract

As noted, City Center bases its breach of contract claim on two provisions in the Letter of Intent: the Due Diligence Clause and the Confidentiality Clause. (<u>See</u> Compl. ¶¶ 48–52.) It asserts that Macy's failed to provide it with environmental reports and failed to disclose an asbestos problem, as purportedly required under the Due Diligence Clause. (<u>Id.</u> ¶¶ 49; 51.) City Center also alleges that Macy's breached the Confidentiality Clause by disclosing the Historic Tax Credit Application and related documents both to the State Historic Preservation Office, and, upon information and belief, to Macy's new buyer and/or others. (<u>Id.</u> ¶ 50.)

Under Minnesota law, a successful breach of contract claim requires proof of four elements: (1) the formation of a contract; (2) the performance by the plaintiff of any

conditions precedent; (3) a material breach of the contract by the defendant; and (4)

damages.  Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd., 703 F.3d 1104,

1107 (8th Cir. 2013) (citations omitted).

### 1. Due Diligence Clause

Macy's contends that City Center's breach of contract claim based on asbestos-

related obligations or conduct fails as a matter of law because the Letter of Intent does not

contain any such binding terms, prior to the execution of the potential Purchase

Agreement.  (Def.'s Mem. Supp. Mot. to Dismiss at 3–6.)   The Court agrees.   Under the

plain language of Section (a) of the Due Diligence Clause, any obligation to disclose

environmental reports would arise in the future, when the Purchase Agreement was

executed:  "The Purchase Agreement will call for Seller to provide Purchaser with copies

of . . . all environmental reports concerning the Properties[.]"  (Letter of Intent at 1–2)

(emphasis added).   No mandatory disclosure was required prior to that time.[3]  The Letter

of Intent reflects the parties' intent that their legal obligations, prior to the execution of

the Purchase Agreement, arose only in limited ways.  (Id. at 5.)  But for those limited

exceptions, the parties were not legally bound to each other "in any manner unless and

until the Purchase Agreement is signed by both parties."  (Id.)  There is no dispute that

the parties never executed the Purchase Agreement.  Because Macy's was under no

---

[3]   Instead, Section (b) of the Due Diligence Clause simply permitted City Center, in its discretion, to conduct any testing that it deemed advisable, during the initial 60 days of the Due Diligence Period, which began upon the execution of the Letter of Intent. (Letter of Intent at 2.)

current obligation to furnish or disclose environmental information to City Center prior to the execution of the Purchase Agreement, this alleged breach cannot form the basis of a claim for breach of contract.

City Center also argues that Macy's committed a breach by preventing City Center from conducting or completing a comprehensive asbestos survey, and that Macy's actions delayed the contemplated signing of a purchase agreement.  (Compl. ¶ 14; Pl.'s Opp'n Mem. at 28 [Doc. No. 14].)   Again, the Letter of Intent contains no language requiring Macy's to facilitate City Center's due diligence prior to the execution of the Purchase Agreement.  Moreover, City Center has failed to plead the conditions precedent necessary to assert such a claim, such as written notice.  (See Letter of Intent at 2.)

In short, City Center does not identify any other possible facts that might support an amended claim, nor can the Court envision such amendments, based on these facts and the plain language of the binding provisions of the Letter of Intent.  For all of the foregoing reasons, Plaintiff's breach of contract claims based on alleged violations of the Due Diligence Clause are dismissed with prejudice.

## 2. Confidentiality Clause

As noted, City Center alleges that Macy's breached the Confidentiality Clause of the Letter of Intent by directly submitting the Historic Tax Credit Application and original photographs to the State Historic Preservation Office and, "upon information and belief, . . . [by disclosing] other transaction documents to the Historic Preservation Office, Macy's new buyer and/or others."  (Compl. ¶ 50.)   The Confidentiality Clause is an

obligatory, legally binding provision of the Letter of Intent. It states, "[T]he parties will maintain the confidentiality of the terms of the transaction and . . . transaction documents[.]" (Letter of Intent at 3.)

In its motion to dismiss, Macy's argues that this basis for City Center's breach of contract claim fails because City Center has not alleged that the Historic Tax Credit Application and supporting materials fall under the Confidentiality Clause. (Def.'s Mem. Supp. Mot. to Dismiss at 6–8.) In addition, Macy's contends that City Center has failed to allege damages stemming from the purported breach. (Id.)

As to Macy's first argument, the Court agrees that City Center fails to allege that the Historic Tax Credit Application and related materials are "transaction documents" subject to the terms of the Confidentiality Clause. Although that term is undefined in the Letter of Intent, the Application instead appears to be a collateral document to the parties' contemplated real estate transaction. Moreover, other language in the Letter of Intent suggests that these documents were not confidential and were not covered by the Confidentiality Clause, as they were to be transmitted to a third party, the State Historic Preservation Office. (See Letter of Intent at 2–3.) And as a general matter, the Letter of Intent demonstrates that the process of obtaining the Historic Tax Credits would inure to Macy's benefit. For instance, in the non-binding Historic Tax Credit Clause, City Center agreed to shoulder the burden of seeking the tax credits, "at no cost or obligation to [Macy's]." (Id. at 3.) Moreover, if a purchase agreement was not executed, or if the sale of the property was not closed, City Center agreed to transfer ownership of the Historic

14

Tax Credit Application and materials to Macy's. (Id. at 3–4.) Accordingly, the Court finds that City Center fails to plausibly allege that the Historic Tax Credit Application and related materials were "transaction documents," subject to the Confidentiality Clause.

Also, while City Center appears to partly base an alleged confidentiality breach on the language used in its email transmissions of the tax credit materials to Macy's, (see Compl. ¶¶ 24; 31), City Center has not alleged that these transmissions constituted a contract, and the Court can find no basis in the pleadings for such a conclusion.

In addition, City Center fails to allege a cognizable right to damages resulting from the alleged confidentiality breach. A breach of contract claim fails as a matter of law where the plaintiff cannot establish damages caused by the breach. See Reuter v. Jax Ltd., 711 F.3d 918, 920 (8th Cir. 2013) (citation omitted). For breach of contract claims, the appropriate measure of damages "is that amount which will place the plaintiff in the same situation as if the contract had been performed." St. Jude Med., S.C., Inc. v. Biosense Webster, Inc., No. 12-CV-621 (ADM/TNL), 2014 WL 6673664, at *6 (D. Minn. Nov. 24, 2014) (quoting Peters v. Mut. Benefit Life Ins. Co., 420 N.W.2d 908, 915 (Minn. Ct. App. 1988)), aff'd, 818 F.3d 785 (8th Cir. 2016).

Here, the contract in question is the Letter of Intent, not the never-executed Purchase Agreement. While City Center alleges that it incurred "tremendous costs," "in excess of $50,000," and missed investment opportunities, (Compl. ¶¶ 4, 52), City Center does not plausibly allege that these damages were caused by Macy's actions with respect to the Historic Tax Credit Application. Regardless of who submitted and/or disclosed the

15

tax credit documents, to place City Center in the same situation as if the contract, i.e., the Letter of Intent, had been performed, would still not guarantee the successful execution of the Purchase Agreement. City Center well knows that the Letter of Intent was a risky proposition, with no assurance of a final Purchase Agreement and closing and the potential for the expenditure of significant funds without any written guarantees. City Center would have missed other possible investment opportunities, incurred costs for the hiring of a tax credit consultant, and expended time on the project simply to comply with its own agreed-upon obligations under the terms of the Letter of Intent. The Letter of Intent merely identified the preliminary steps that <u>might</u> lead the parties to the successful negotiation of a purchase agreement. It contained no mechanism for the reimbursement of City Center's negotiating expenses.

City Center also asserts that damages in cases involving breach of confidentiality agreements may be measured not only by the amount of the plaintiff's loss, but also by the amount of the defendant's gain resulting from the breach. (Pl.'s Opp'n Mem. at 27) (citing <u>Cherne Indus., Inc. v. Grounds & Assocs., Inc.</u>, 278 N.W.2d 81, 94 (Minn. 1979); <u>Storage Tech. Corp. v. Cisco Sys., Inc.</u>, 395 F.3d 921, 925 (8th Cir. 2005); <u>Ahle v. Veracity Research Co.</u>, 641 F. Supp. 2d 857, 861 (D. Minn. 2009)). Arguing that it lost the benefit of the Historic Tax Credit Application, City Center also contends that "it appears Macy's has profited or will profit from its improper use and disclosure of the application." (<u>Id.</u> at 27–28.) More specifically, City Center surmises that Macy's "may well have used" the Historic Tax Credit Application "to gain comfort from Macy's new

buyer to move forward."  (Id.)

The Court disagrees and finds City Center's legal authority distinguishable, as those cases arise in the particular context of employment litigation resulting from the breach of confidentiality and non-compete agreements, see Cherne, 278 N.W.2d at 94 ("[W]here an employee wrongfully profits from the use of information obtained from his employer, the measure of damages may be the employee's gain."); Storage Tech., 395 F.3d at 925 (stating that an employee who breaches a non-compete covenant can be required to account for his profits), and the misappropriation of trade secrets.  See Ahle, 641 F. Supp. 2d at 861 (finding that damages for the misappropriation of trade secrets can include both actual loss and the unjust enrichment caused by the misappropriation).  City Center is not an employee of Macy's, nor does it allege that the Historic Tax Credit Application contained any trade secrets that would have remained confidential, but for the purported breach.  To the contrary, as Macy's notes, "[u]nlike customer lists and other trade secrets, the tax credit documents were created for the very purposes of being publicly disclosed."  (Def.'s Reply at 5 [Doc. No. 16].)  Although the terms of the Letter of Intent contemplated that City Center would submit the application, (Letter of Intent at 5) ("Seller acknowledges that Purchaser intends to pursue Historic Tax Credits. . . . Purchaser acknowledges the application must be complete and submitted within 60 days of Letter of Intent execution. . . ."), nothing in the Letter of Intent prohibited Macy's from submitting the application.  Nor is the Historic Tax Credit Clause one of the binding terms of the parties' agreement.  (See Letter of Intent at 5.)  City Center's allegation that

Macy's might have disclosed the Historic Tax Credit Application to a new buyer, (Pl.'s Opp'n Mem. at 27–28; Compl. ¶ 50), is simply rank speculation, unsupported by any facts. Consequently, it is inconsistent with the pleading requirements of Iqbal, which requires the pleading of sufficient factual allegations, accepted as true, to state a facially plausible claim, 556 U.S. at 678, and Twombly, which requires that a plaintiff's claimed right to relief rise "above the speculative level." 550 U.S. at 555.

To the extent that Plaintiff alleges damages stemming from "delays in the signing of the Purchase and Sale Agreement," (Pl.'s Opp'n. Mem. at 28–29), again, the terms of the Letter of Intent were largely prospective. Nothing in the Letter of Intent accounted for remedies based on delay. City Center has not pleaded any facts to support a reasonable inference that it was entitled to enter into the Purchase Agreement, or that the parties agreed that City Center would be compensated if their negotiations failed.

For all of these reasons, City Center's claim as it relates to the purported confidentiality breach fails as a matter of law. City Center has not requested an opportunity to amend its pleading, nor can the Court envision any possible amendments that could correct the pleading deficiencies concerning damages. City Center's breach of contract claim based on the alleged breach of the Confidentiality Clause is therefore dismissed with prejudice.

## C. Breach of the Implied Covenant of Good Faith and Fair Dealing

City Center alleges that Macy's breached the implied covenant of good faith and fair dealing by "ma[king] it impossible for City Center to finalize this transaction sooner

because Macy's repeatedly created unnecessary issues for City Center that had to be resolved." (Compl. ¶ 55.) Specifically, City Center asserts that the following acts or omissions by Macy's created the impossibility of finalizing the sale earlier: (1) failing to disclose the asbestos problem; (2) failing to obtain written consents from the landowners with ground leases on the Property; (3) requiring City Center to send its draft application as "proof" of completeness, submitting the application itself; and (4) prohibiting City Center from speaking with representatives of the City of Minneapolis. (Id.)

However, in Macy's Rule 12(b)(6) motion, it asserts that City Center has failed to allege that Macy's made it impossible for City Center to perform the binding obligations set forth in the only contract between the parties, the Letter of Intent. (Def.'s Mem. Supp. Mot. to Dismiss at 8-9.)

Under Minnesota law, a covenant of good faith and fair dealing is inferred in every contract, requiring that a party to a contract not 'unjustifiably hinder' the performance of the contract by the other party. In re Hennepin Cnty. 1986 Recycling Bond Litig., 540 N.W.2d 494, 502–03 (Minn. 1995). Importantly, such implied covenants must be within the scope of the underlying contract. Id.

City Center's allegations do not fall within the scope of the Letter of Intent. Instead, City Center alleges that Macy's breached this covenant by "ma[king] it impossible for City Center to finalize this transaction sooner[.]" (See Compl. ¶¶ 8–11.) Specifically, in its opposition memorandum, City Center cites Macy's alleged failure to disclose the asbestos problem, its refusal to permit a comprehensive asbestos study, its

prohibitions against City Center's direct contacts with the City of Minneapolis, and its failure to obtain written consents for the Historic Tax Credit Application. (Pl.'s Opp'n Mem. at 30) (citing Compl. ¶¶ 13–15; 21; 55.) Macy's, however, was not legally bound to do any of those things, as they were not among the limited obligatory provisions of the Letter of Intent. (<u>See</u> Letter of Intent at 5–6.)

In sum, City Center fails to plead the ways in which Macy's made it impossible for it to perform the binding provisions of the Letter of Intent. Because City Center's allegations go beyond the applicable scope of the Letter of Intent, and it offers no possible amendments to correct these deficiencies, this claim fails as a matter of law. It is dismissed with prejudice.

## D. Promissory Estoppel

City Center's promissory estoppel claim is based on Macy's alleged verbal representations that: (1) Macy's was exclusively negotiating with City Center for the sale of the property; (2) Macy's only requested the Historic Tax Credit Application draft and associated photographs for its review, not submission; (3) City Center was the would-be purchaser of the Property; (4) City Center and Macy's were only "a couple of days away" from signing the Purchase Agreement; (5) Macy's was committed to executing the Purchase Agreement during the last week of December 2016; and (6) Macy's would close on its sale of the Property to City Center by the end of January 2017. (Compl. ¶¶ 27; 33; 36; 58).

A claim of promissory estoppel requires a plaintiff to show that "(1) there was a

clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice." Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 834 (Minn. 2011) (citing Olson v. Synergistic Techs. Bus. Sys., Inc., 628 N.W.2d 142, 152 (Minn. 2001)). As Defendant observes, this equitable doctrine only implies a contract where none exists in fact. (Def.'s Mem. Supp. Mot. to Dismiss at 9) (citing Martens v. Minn. Min. & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000)). Therefore, the doctrine only applies if no contract exists. Banbury v. Omnitrition Int'l, 533 N.W.2d 876, 881 (Minn. Ct. App. 1995) (citations omitted). For example, in Banbury, the plaintiffs argued that the defendants should be estopped from relying on an at-will employment clause, asserting that the defendant's promissory statements and conduct caused them to believe that they could only be terminated for cause. Id. at 880–81. But finding that the parties' relationship was governed by a written agreement, the Minnesota Court of Appeals concluded that the promissory estoppel claim was barred. Id. at 880; see also Del Hayes & Sons, Inc. v. Mitchell, 230 N.W.2d 588, 593 (Minn. 1975) ("The doctrine of promissory estoppel is wholly inapplicable here for the simple reason that an actual contract existed.").

Here, City Center's claim fails as a matter of law because of the existence of a valid contract covering the same subject matter. As an initial matter, City Center does not contest the validity of the Letter of Intent. Among the subject matter covered by the Letter of Intent are the parties' binding agreements concerning exclusivity, timing, and the return of the Seller's earnest money if its application for Historic Tax Credits proved

to be unsuccessful.[4]  (Letter of Intent at 2; 3; 5.)  Therefore, like the plaintiffs in <u>Banbury</u>, City Center cannot invoke the doctrine of promissory estoppel in the face of the Letter of Intent or use the doctrine to alter the contract's terms.

Moreover, even if the alleged verbal agreements were not covered by the Letter of Intent, or if there were no contract, this claim would still fail.   Minnesota's Statute of Frauds requires every contract for the sale of land to be in writing.  <u>See</u> Minn. Stat. § 513.05.[5]  While the equitable doctrine of promissory estoppel may take a verbal agreement outside of the statute of frauds, <u>see</u> <u>Del Hayes</u>, 230 N.W.2d at 593–94, the detrimental reliance of the party seeking to enforce the promise must be "of such a character and magnitude that refusal to enforce the contract would permit one party to perpetrate a fraud."  <u>Id.</u> at 594; <u>see also</u> <u>Regions Treatment Center, LLC v. New Stream Real Estate</u>, No. 13-cv-1752 (ADM/LIB), 2014 WL 107792 at *5 (D. Minn. Jan. 10, 2014) (citing <u>Del Hayes</u>, 230 N.W.3d at 593–94); <u>Casazza v. Kiser</u>, 313 F.3d 414, 421–22 (8th Cir. 2002)).

---

[4] Specifically, City Center's negotiating exclusivity would expire on the earliest of 30 days after either Macy's acceptance of the Letter of Intent, the execution of the Purchase Agreement, or the written termination of the Letter of Intent by City Center. (Letter of Intent at 5.)  Because no purchase agreement was ever executed, nor did City Center terminate the Letter of Intent, Macy's promise to exclusively negotiate with City Center expired 30 days after the August 15, 2016 execution of the agreement.  The Letter of Intent also provided for a binding, 120-day Due Diligence period, starting on August 15, 2016 and not to be extended beyond the 120 days.  (<u>Id.</u> at 2.)

[5] The Court rejects City Center's argument that the alleged verbal promises were unrelated to the sale of the Property itself, making the Statute of Frauds inapplicable. (<u>See</u> Pl.'s Opp'n Mem. at 18–19.)  The alleged promises all concerned the parties' efforts to negotiate the sale of the Property.

Taking City Center's facts as true, "it is a question of law as to whether they rise to the level of promissory estoppel." Grueling v. Wells Fargo Home Mortg., Inc., 690 N.W.2d 757, 761 (Minn. Ct. Ap. 2005) (citing Martens, 616 N.W.2d at 746). City Center asserts that in reliance on Macy's verbal promises, it invested significant time and money into the proposed transaction, while Macy's was simultaneously negotiating with another buyer. (Compl. ¶ 60.) The plaintiff in Regions presented similar allegations, asserting that it had made significant expenditures in preparation for the closing of a purchase agreement. Regions, 2014 WL 107792, at *5. However, this Court rejected Regions' argument and dismissed its promissory estoppel claim, finding it "not unusual" to incur expenses in anticipation of a large real estate transaction. Id. While the Court found that the defendant's alleged conduct in Regions could be characterized as "opportunistic," it was "not unjust or harm of such character and magnitude that it amount[ed] to fraud." Id.

The same is true here. Granted, City Center alleges that Macy's verbal statements provided it with some sense of assurance. (See Compl. ¶¶ 5; 27; 33; 34.) But promissory estoppel is not appropriate in situations where a party is aware that a promised result may not occur. See Javinsky v. Comm'r of Admin., 725 N.W.2d 393, 398–99 (Minn. Ct. App. 2007) (citing Faimon v. Winona State Univ., 540 N.W.2d 879, 883 (Minn. Ct. App. 1995)). City Center and Macy's, two sophisticated business entities, were engaged in a risky, ongoing negotiation process for the prospective completion of a purchase agreement, with no guarantee of success. Had City Center required certainty concerning exclusivity, timing, and the submission of the Historic Tax Credit

23

Application, it could have bargained for the inclusion of additional terms in the Letter of Intent to account for various scenarios. Or it could have bargained for and entered into a superseding agreement. And although City Center suspects that negotiations with another buyer were underway, City Center does not plead sufficient facts to support this inference, beyond mere speculation. The outcome of the parties' negotiations was understandably disappointing to City Center. But taking as true only those facts plausibly alleged by City Center, the Court cannot find any factual basis to support its position that Macy's conduct rose to the level of fraud.

In addition, under a more restrictive approach to the applicability of the Statute of Frauds to a promissory estoppel claim ("the Restatement approach"), promissory estoppel will defeat the Statute of Frauds "only when the promise relied upon is a promise to reduce the contract to writing." Casazza, 313 F.3d at 421 (citing Del Hayes, 230 N.W.2d at 593–94.) The Minnesota Supreme Court does not appear to have formally adopted a particular approach, and this Court has found the less restrictive approach, discussed above, to be "favored" by the Minnesota Court of Appeals and the Eighth Circuit. Regions, 2014 WL 107792, at *5. Nevertheless, courts applying Minnesota law have used the Restatement approach to dismiss promissory estoppel claims, where no allegations suggest the presence of a promise to reduce the agreement to writing. See id. at 422; Ruud v. Great Plains Supply, Inc., 526 N.W.2d 369, 372 (8th Cir. 1995). Under this approach, City Center's claim likewise fails, as there is no allegation of a promise to reduce Macy's alleged verbal promises to writing.

24

For all of these reasons, the Court finds that City Center's promissory estoppel claim fails as a matter of law. While an amended pleading might overcome some of the pleading deficiencies, it could not overcome the fact that, as a matter of law, a valid contract governs the subject matter that forms the bases for City Center's promissory estoppel claim. Additionally, the Statute of Frauds bars the enforcement of any verbal agreements for the sale of land. Accordingly, this claim is dismissed with prejudice.

### E.     Unjust Enrichment

As noted, City Center's claim for unjust enrichment broadly alleges that "Macy's has been unjustly enriched, and City Center has been unjustly damaged" by Macy's alleged actions. (Compl. ¶ 66.) In its opposition memorandum, City Center provides some additional detail, asserting that by filing the Historic Tax Credit Application, Macy's "stole City Center's work product," and then used its work product "in order to complete the sale of the Property to another buyer." (Pl.'s Opp'n. Memo at 23.) In the Complaint, City Center does not plead this claim as an alternative to breach of contract, but as a stand-alone claim.

Macy's asserts that the unjust enrichment claim must be dismissed because it is fatally vague and contains mere boilerplate language reciting the elements of an unjust enrichment claim. (Def.'s Mem. Supp. Mot. to Dismiss at 14–15.) And, to the extent that the Historic Tax Credit Application and photographs constitute "something of value," Macy's argues that City Center knowingly and willingly provided the items to Macy's. (Id. at 15.) Moreover, Macy's asserts that the Letter of Intent contemplated the transfer of

these items to Macy's, and City Center does not allege that the application was successful or that Macy's experienced any actual benefit.  (Id.)

"Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012).  However, under Minnesota law, a party may not obtain equitable relief where an adequate remedy at law is available.  United States v. Bame, 721 F.3d 1025, 1030 (8th Cir.2013) (citing ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 305 (Minn. 1996)).  Therefore, because an unjust enrichment claim is premised on an implied-in-law contract or quasi-contract, it will not lie when the parties' rights are governed by an enforceable contract.  Caldas, 820 N.W.2d at 838; see also Ventura v. Kyle, 825 F.3d 876, 888 (8th Cir. 2016) (reversing unjust enrichment judgment for the plaintiff and finding that a common law defamation claim would provide an adequate legal remedy).  In Bame, the Eighth Circuit stated that it is the existence of a legal remedy that precludes an equitable remedy, not whether a plaintiff pursues the legal remedy or not.  721 F.3d 1025  at 1032.  The court observed that it would be anomalous to allow unjust enrichment recovery "merely because the plaintiff fashioned the pleadings a certain way." Id.  Courts have therefore dismissed unjust enrichment claims even when a legal remedy was no longer available.  See, e.g., Drobnak v. Andersen Corp., 561 F.3d 778, 787 (8th Cir. 2009) (affirming dismissal of unjust enrichment claim where plaintiffs would have had an adequate legal remedy had they adhered to Rule 9(b) pleading

requirements); <u>Kelley v. Coll. of St. Benedict</u>, 901 F. Supp. 2d 1123, 1132–33 (D. Minn. 2012) (dismissing claim of unjust enrichment because of adequate statutory remedy, even though the statute of limitations for the statutory claim had expired); <u>Mon-Ray, Inc. v. Granite Re, Inc.</u>, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004) (holding that even though a legal remedy was unavailable due to strict time restrictions, plaintiffs failed to avail themselves of it and could not seek relief under the equitable theory of unjust enrichment).

The allegations supporting City Center's unjust enrichment claim simply state that "Macy's has been unjustly enriched and City Center has been unjustly damaged." (<u>See</u> Compl. ¶¶ 65–67.) City Center also incorporates by reference "all preceding paragraphs." (<u>Id.</u> ¶ 65.) In other words, the facts that support City Center's breach of contract claim are the same facts that support its unjust enrichment claim. City Center also appears to seek the same relief. Moreover, City Center has not alleged or indicated why its legal remedy is inadequate. In short, the parties' rights are governed by the Letter of Intent. As a matter of law, City Center may not pursue the equitable remedy of unjust enrichment due to the existence of an adequate legal remedy, a breach of contract claim, regardless of the availability of that claim. Accordingly, City Center's unjust enrichment claim must be dismissed with prejudice.

But even if the Court examines the substance of City Center's unjust enrichment pleading, the claim still fails. City Center's pleading lacks sufficient factual allegations to meet the requirements of <u>Iqbal</u> and <u>Twombly</u>. Under Minnesota law, a claim for unjust

enrichment requires a showing that the defendant received something of value to which it was not entitled, the plaintiff conferred the benefit unknowingly or unwillingly, and it would be unjust, under the circumstances, for the defendant to retain the benefit. Gen. Mktg. Servs. v. Am. Motorsports Inc., 393 F. Supp. 2d 901, 909 (D. Minn. 2005) (citations omitted).

City Center's pleading does not identify the "something of value" that it allegedly received. It simply alleges that "Macy's has been unjustly enriched and City Center has been unjustly damaged in an amount in excess of $50,000[.]" (Compl. ¶ 66.) Even if the Court were to consider the additional allegation that City Center offers in its opposition memorandum—that Macy's stole its Historic Tax Credit Application work product and used it to quickly negotiate and finalize the sale to the new buyer (Pl.'s Opp'n Mem. at 23)—this still fails to state a claim on which relief can be granted. City Center's own allegations establish that it provided the Historic Tax Credit Application and supporting materials to Macy's knowingly and willingly. (See Compl. ¶¶ 23, 30–31.) In addition, the Letter of Intent makes clear that in the event the Purchase Agreement was not executed or the sale not closed, the Historic Tax Credit Application materials would transfer to Macy's. (Letter of Intent at 3.) That Macy's ultimately benefitted from the Historic Tax Credit Application materials appears from the pleadings to have been an intended consequence of the Letter of Intent, and City Center has failed to allege any facts to the contrary.

In addition, City Center's claim that Macy's intended to use Plaintiff's work

product to bolster its bargaining position with another party is based on bald speculation. City Center presents no plausible allegations supporting this inference.  (See Pl.'s Opp'n. Memo at 23.)   In sum, City Center's unjust enrichment claim fails as a matter of law.

 For the above reasons, Plaintiff's unjust enrichment fails as a matter of law and must be dismissed.  Again, because of the existence of an adequate legal remedy and because City alleges no other possible facts that could support this claim, it is dismissed with prejudice.

### F.    Attorneys' Fees

Macy's also moves to dismiss or strike City Center's request for attorneys' fees. City Center contends that it is entitled to seek attorneys' fees because it expended money for legal services in connection with the potential purchase of the Property.  (Pl.'s Opp'n Mem. at 31.)  It also asserts that its request for attorneys' fees essentially serves as a placeholder in the event that it "seek[s] sanctions down the road if Macy's files a frivolous pleading or withholds discoverable information in bad faith."  (Id. at 32.)

A litigant's right to recover attorneys' fees must be based on either a statute or a contract.  Dunn v. Nat'l Beverage Corp., 745 N.W.2d 549, 554 (Minn. 2008) (citations omitted).  No such basis supports an award of attorneys' fees for City Center's common law claims here.  To the extent that it seeks to recoup its past legal fees incurred in the negotiation process, i.e., fees not incurred in this litigation, City Center unnecessarily confuses the issue by pleading a request for "attorneys' fees."  The inclusion of a request for attorneys' fees in a complaint generally refers to fees incurred in the instant litigation,

for which statutory or contractual authority is required.

City Center cites authority for the proposition that plaintiffs may recover legal fees as reliance damages. (Pl.'s Opp'n Mem. at 31) (citing Walser v. Toyota Motor Sales, U.S.A., Inc., 43 F.3d 396, 402 (8th Cir. 1994); Tel. Assocs., Inc. v. St. Louis Cnty. Bd., 364 N.W.2d 378, 383 (Minn. 1983)). But these cases do not require a plaintiff seeking to recover underlying, pre-litigation legal expenses to plead a request for attorneys' fees.[6] Instead, City Center's general request for damages would appear to sufficiently preserve its right to seek such relief for underlying, pre-litigation legal expenses.

And as to attorneys' fees for work incurred in the instant litigation, there is no basis for the inclusion of this request in the Complaint. To the extent that City Center speculates about the possible need to seek relief for discovery violations at some point in the future, the Federal Rules provide for such relief, as City Center itself acknowledges. (Pl.'s Opp'n Mem. at 32) (citing Fed. R. Civ. P. 11 & 37). City Center need not include an attorneys' fees placeholder in its Complaint in order to seek sanctions for discovery violations. As with its request to seek relief for underlying attorneys' fees, including a

---

[6] Moreover, Walser contains no mention of attorneys' fees, but simply limits the plaintiffs' damages on their promissory estoppel claim to underlying out-of-pocket expenses made in reliance on the defendant's promise. See 43 F.3d at 400–01. In Telephone Associates, the unsuccessful lowest bidder for a public contract received, as part of its costs and expenses, attorneys' fees from the time that it first intervened at the country board level through the state district court's denial of a temporary restraining order concerning the county board's decision. 364 N.W.2d at 383. While the Minnesota Supreme Court found that the expenses for the largely underlying proceedings were compensable, it cut off any award of costs and expenses beyond the denial of injunctive relief. Id.

request for attorneys' fees for speculative discovery violations in the instant litigation is unnecessary and confusing. Because there is no entitlement to attorneys' fees here, Macy's motion is granted in this respect.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.   Defendant Macy's Retail Holdings, Inc.'s Motion to Dismiss [Doc. No. 6] is **GRANTED**;

2.   Plaintiff's claim for breach of contract (Count I) is **DISMISSED WITH PREJUDICE**;

3.   Plaintiff's claim for breach of the implied covenant of good faith and fair dealing (Count II) is **DISMISSED WITH PREJUDICE**;

4.   Plaintiff's claim for promissory estoppel (Count III) is **DISMISSED WITH PREJUDICE**;

5.   Plaintiff's claim for unjust enrichment (Count IV) is **DISMISSED WITH PREJUDICE**; and

6.   Plaintiff's requested relief in the form of attorneys' fees is **DISMISSED and STRICKEN** from the Complaint.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   September 13, 2017

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge
